# SELMA, ROME AND DALTON RAILROAD COMPANY *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 12.   Argued March 25, 26, 1891. — Decided April 6, 1891.

In an action against the United States to recover for amounts due certain mail contractors under the appropriation in the sundry civil appropriation act of March 3, 1877, 19 Stat. 362, c. 105, which provided that " any such claims which have been paid by the Confederate States government shall not again be paid; " the burden of proof is on the plaintiff to show that his claim was not of the excepted class.

Whether, that appropriation having been covered into the Treasury, a claimant can maintain suit under that act in the Court of Claims without further legislation, is a question which the court has not deemed it necessary to consider.

APPEAL from the Court of Claims where the judgment was against the claimant.   The case is stated in the opinion.

*Mr. George A. King* for appellant.

*Mr. Assistant Attorney General Cotton* for appellee.

MR. JUSTICE HARLAN delivered the opinion of the court.

The plaintiff, the Selma, Rome and Dalton Railroad Company, seeks in this action to recover the sum of $5915.80, which

is alleged to be the balance due on a written contract executed July 10th, 1858, between the United States and the Alabama and Tennessee Rivers Railroad Company, an Alabama corporation, whereby that corporation was to receive for transporting the mail between Selma and Taladega, in that State, the sum of $12,000 per year, payable quarterly, for the term commencing July 1, 1858, and ending May 31st, 1862. By that contract the Postmaster General was authorized to dispense with the service entirely, if required by the public interest, allowing one month's extra pay upon the amount deducted. The United States disputes its liability to the plaintiff in any sum whatever.

The Alabama and Tennessee Rivers Railroad Company performed the services required by the above contract up to the 31st of May, 1861, on which day the mail service on its road was discontinued by the Postmaster General of the United States; and such service passed, on and after June 1, 1861, under the direct control of, and was performed by the railroad company for the Confederate government.

By an act of the Confederate Congress, approved August 30, 1861, entitled "An act to collect for distribution the moneys remaining in the several post offices of the Confederate States at the time the postal service was taken in charge by said government," it was provided:

"§ 1. That it shall be the duty of the Postmaster General to collect all moneys due from the several postmasters within the Confederate States, and which they had not paid over at the time the Confederate States took the charge of the postal service, and the several postmasters are hereby required to account to the general post office of this government under the same rules, regulations and penalties that were prescribed by the law under which said moneys were received.

"§ 2. The moneys so received shall be kept separate and distinct from the other funds of the Post Office Department, and shall constitute a fund for the *pro rata* payment of claims for postal service which accrued before the Postmaster General took charge of the postal service in the States respectively comprising this Confedcracy, as may hereafter be provided.

" § 3. It shall be the duty of the Postmaster General to make proclamation that all persons who are citizens of the Confederate States of America, and who may have rendered postal service in any of the States of this Confederacy, under contracts or appointments made by the United States government before the Confederate States government took charge of such service, shall present their claims to this department, verified and established according to such rules as he shall prescribe, by a time therein to be set forth, not less than six months, and requiring the claimant to state, under oath, how much has been [paid] and the date of such payments, on account of the contract or appointment under which said claim occurred, and what fund or provision has been set apart or made for the further payment of the whole or any portion of the balance of such claim by the government of the United States, or of any of the States; and they shall also state, on oath, whether they performed · fully the service according to their contracts or appointments during the time for which they claim pay, and if not, what partial service they did perform, and what deductions have been made from their pay, so far as they know, on account of any failure, or partial failure, to perform such service; and the Postmaster General shall, as soon as he shall have collected such moneys from said postmasters, and ascertained the amount of claims against the Post Office Department and the amount received respectively by the claimants as aforesaid, and the provisions, if any, for future payment, make a report of the same, so that future action may be taken thereon as respects the distribution.

" § 4. All claims for postal service required to be presented by this bill shall be barred as against this fund, unless presented within six months after the proclamation of the Postmaster General shall have been made."

By another act of the Confederate Congress, approved September 27, 1862, entitled "An act to provide for the payment of sums ascertained to be due for postal service to citizens of the Confederate States' by the Postmaster General," it was provided: " The Congress of the Confederate States of America do enact, That the Postmaster General of the Confederate

States do proceed to pay to the several persons, or their lawfully authorized agents or representatives, the sums respectively found due and owing to them for postal service rendered in any of the States of this Confederacy, under contracts or appointments made by the United States government before the Confederate States government took charge of such service, as the said sums have been audited and ascertained by him under the provisions of an act entitled ' An Act to collect for distribution the moneys remaining in the several post offices of the Confederate States at the time the postal service was taken in charge by said government,' approved the 30th of August, 1861; but the sums authorized by this act to be paid are only the balances found due after all proper deductions shall have been made on account of previous payments made by the United States, or any of the States, or of available provisions made in whole or in part for such payment by said government, or of any of the States, and after making all proper deductions for failures or partial failures to perform the service according to their several contracts or appointments during the time for which they claim pay: *Provided,* That the provisions of this act shall only extend to loyal citizens of the Confederate States."

The Congress of the United States, by joint resolution, passed March 2, 1867, prohibited the payment of any account, claim or demand against the government to any person not known to have been opposed to the rebellion and in favor of its suppression. 14 Stat. 571. This resolution was carried forward into section 3480 of the Revised Statutes, which provides: "It shall be unlawful for any officer to pay any account, claim or demand against the United States which accrued or existed prior to the 13th day of April, 1861, in favor of any person who promoted, encouraged or in any manner sustained the late rebellion, or in favor of any person who during such rebellion was not known to be opposed thereto, and distinctly in favor of its suppression; and no pardon heretofore granted, or hereafter to be granted, shall authorize the payment of such account, claim or demand, until this section is modified or repealed. But this section

shall not be construed to prohibit the payment of claims founded upon contracts made by any of the departments, where such claims were assigned or contracted to be assigned prior to the first day of April, 1861, to the creditors of such contractors, loyal citizens of loyal States, in payment of debts incurred prior to the first day of March, 1861."

By an act of the legislature of Alabama, approved February 8, 1867, the consolidation of the Dalton and Jacksonville Railroad Company and the Georgia and Alabama Railroad Company, corporations of Georgia, with the Alabama and Tennessee Rivers Railroad Company, under the name of the Selma, Rome and Dalton Railroad Company, was ratified, and the consolidated company invested with all the rights, functions, powers and privileges of the Alabama and Tennessee Rivers Railroad Company.

The petition alleges that neither the plaintiff nor any one for it ever received payment for services rendered under the above contract, during the period from January 1, 1861, to May 31, 1861, inclusive, except a small amount (found by the court below to be $95.19) or any compensation for the discontinuance of that contract. For the reasons set forth in the opinion of the Court of Claims in *Blount, Adm'r,* v. *United States,* 21 C. Cl. 274, this action was dismissed.

The present suit is based upon a clause in the act of Congress, approved March 3, 1877, making appropriations for sundry civil expenses of the government for the fiscal year ending June 30, 1878. 19 Stat. 344, 362, c. 105. No right is asserted to recover independently of that act. The clause in question provides: "That the sum of three hundred and seventy-five thousand dollars, or so much thereof as may be necessary, be appropriated to pay the amount due to mail contractors for mail service performed in the States of Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, South Carolina, Texas, Tennessee, Virginia and West Virginia in the years eighteen hundred and fifty-nine, eighteen hundred and sixty, eighteen hundred and sixty-one, and before said States respectively engaged in war against the United States; and the provisions

of [section] three thousand four hundred and eighty of Revised Statutes of the United States shall not be applicable to the payments therein authorized: *Provided*, That any such claims which have been paid by the Confederate States government shall not again be paid."

We have seen that by the act of the Confederate Congress of August 30th, 1861, provision was made for the collection from postmasters within the Confederate States of all moneys due from them and not paid over to the United States at the time the insurrectionary government took charge of the postal service within the territory subject to its control; the sums, so collected to constitute a separate and distinct fund for the *pro rata* payment of claims against the United States for postal service accruing before the control of that service was assumed by the Confederate States. And, by the Confederate enactment of September 27, 1862, the moneys so collected were directed to be used in paying " to loyal citizens of the Confederate States " having unpaid claims for postal services rendered in any of the Confederate States " under contracts or appointments made by the United States government before the Confederate States government took charge of such service." It is not disputed that the claim here in suit is of the class for the payment of which the Confederate enactment of 1862 made provision. It is stated in *Blount, Adm'r*, v. *United States*, 21 C. Cl. 274, 279, that $502,017.19 were paid out by the Confederate government, under the above acts of 1861 and 1862, but to whom did not appear. In the present case no such fact appears. Nor does it appear by direct, positive proof in this case that any claims of that character were ever paid by the Confederate government to any one.

It is, however, contended by the United States that the act of March 3, 1877, embraces only claims that appear not to have been paid by the Confederate government. The contention of the plaintiff is that it is entitled to judgment, by force of that act, upon proof of services rendered by it, unless the United States shows, affirmatively, that its claim was paid by the Confederate States government. These contentions rest

upon radically different interpretations of the act of 1877. We are of opinion that Congress intended to provide for the payment of only such claims as appeared not to have been paid by the Confederate government. As the claims described in that act had been, at the date of its passage, outlawed by limitation or by express enactment forbidding their payment, and as Congress must be presumed to have passed that act with knowledge of the Confederate legislation of 1861 and 1862, we cannot believe that it was intended to impose upon the United States the burden of showing, affirmatively, that such claims had been paid by the Confederate government. The object of the proviso, "that any such claims which have been paid by the Confederate States government shall not again be paid," was to indicate the class of cases which the act embraced. One of the objects of a proviso is to qualify or restrain the generality of the enacting clause, "or to exclude some possible ground of misinterpretation of it as extending to cases not intended by the legislature to be brought within its purview." *Minis* v. *United States,* 15 Pet. 423, 445. If Congress had simply declared — without embodying the declaration in a "proviso" — that all claims of the kind described, not previously paid by the Confederate government, should be recognized and paid, it would never occur to any one that the United States assumed the burden of showing that such claims had been thus paid. The act of 1877 was, in effect, an invitation to all having claims of the class described in it, which had not been paid by the Confederate States, to present them for payment out of the sum appropriated by it for that purpose, leaving those seeking the benefit of the act to show that their claims were of that class. Besides, as the fact of payment or non-payment by the Confederate government was peculiarly within the knowledge of the claimant or within his power — if in the power of any one — to establish, it may well be supposed that Congress intended that a claimant, as a condition of payment by the United States, should show that his demand belonged to the class for which the act of 1877 provided. But there was no proof on the subject by the plaintiff, nor does it appear, if that fact were material, that such proof

was impossible. It prepared the case and went to a hearing upon the theory that it was entitled to judgment, upon proof simply of the services rendered, unless the United States showed that the claim in suit had been, in fact, paid by the Confederate government. We cannot accept that interpretation of the act.

If, however, the burden of proof was on the United States to show that the plaintiff's claim had been paid by the Confederate government, it would not follow that the plaintiff is entitled to judgment. Proof of the Confederate legislation of 1861 and 1862, under which "loyal citizens of the Confederate States" were assured of payment out of moneys belonging to the United States, and in the hands of its appointees, at the time the Confederate government assumed control of the postal service within the country over which it exercised authority — which moneys the Confederate government undertook to collect for distribution among those loyal to it — in connection with the fact that, when the Confederate acts of 1861 and 1862 were passed, the plaintiff was carrying the mail for the Confederate government, and, therefore, was in a position to enjoy the benefit of its legislation, made a *prima facie* case which required the plaintiff to disclose such facts as were peculiarly within its knowledge, and thereby make some showing that its claim had not been paid; a fact negative in form, but capable of proof affirmative in its nature by the party who knew, or could easily ascertain, the truth of the case. While the general rule is that the burden of proof is where the pleadings place it, namely, upon the party against whom judgment must go, if no evidence whatever is introduced, its application is often affected by circumstances. "From the very nature of the question in dispute," says Mr. Best, "all, or nearly all, the evidence that could be adduced respecting it must be in the possession of, or be easily attainable by, one of the contending parties, who accordingly could at once put an end to litigation by producing that evidence; while requiring his adversary to establish his case, because the affirmative lay on him, or because there was a presumption of law against him, would, if not amounting to injustice, at least be produc-

tive of expense and delay. In order to prevent this, it has been established as a general rule of evidence, that the burden of proof lies on the person who wishes to support his case by a particular fact which lies more peculiarly within his knowledge, or of which he is supposed to be cognizant." Principles of Evidence, § 274; 1 Greenl. Ev. § 79; Starkie Ev. 589. The books of account kept by the Alabama and Tennessee Rivers Railroad Company, or some one connected with that corporation while it was serving the Confederate government, might throw light upon the question of payment. The presumption is that the plaintiff has possession of those books, and that, in connection with the evidence of those who kept them, they would disclose whether the original contractor had or had not been paid by the Confederate government out of the moneys of the United States which it appropriated. It did not produce them. And there is no finding inconsistent with the presumption that it was entirely within its power to show, if such were the fact, that its claim had not been paid by the Confederate government. So that the reasonable inference from the facts found — assuming that the burden of proof was upon the United States — is, that the plaintiff's claim was not of the class for the payment of which Congress legislated in 1877.

It appears from the finding of facts that shortly after the passage of the act of 1877 the Secretary of the Treasury issued an order that no payments be made out of the appropriation of $375,000 until all claims covered by the terms of the act should be received and adjusted, and that if the appropriation proved to be insufficient to pay all so adjusted, they should be paid *pro rata*. In consequence of that order no claims were adjusted within two years after the date of that act, and the appropriation was covered into the Treasury under the requirement of the fifth section of the legislative, executive and judicial appropriation act of June 20, 1874. 18 Stat. 85, c. 328. Whether, under these circumstances, a claimant under the act of 1877 could maintain a suit in the Court of Claims against the United States, without further legislation by Congress, or without a new appropriation, is a question which, in view of the disposition of the case upon other grounds, we have not deemed it necessary to consider.          *Judgment affirmed.*