473 So.2d 1297 (1984)
Gregoria VALCIN and Gerard Valcin, Her Husband, Appellants,
v.
PUBLIC HEALTH TRUST of Dade County, D/B/a Jackson Memorial Hospital, Appellee.
No. 81-2131.
District Court of Appeal of Florida, Third District.
June 5, 1984.
On Motions for Clarification and Rehearing August 20, 1985.
*1299 Virgin, Whittle & Garbis and Gary E. Garbis and Thomas P. Murphy, Miami, for appellants.
Walton, Lantaff, Schroeder & Carson and George Chesrow and Kathleen M. O'Connor, Miami, for appellee.
Before SCHWARTZ, C.J., and DANIEL S. PEARSON and FERGUSON, JJ.
On Appellee's Motions for Clarification and Rehearing August 20, 1985.
DANIEL S. PEARSON, Judge.
In May 1978, after Gregoria Valcin had given birth to her fifth child at Jackson Memorial Hospital, she asked to be sterilized. Accordingly, Dr. Shroder, a member of the hospital staff,[1] performed a Pomeroy tubal ligation on Valcin six days after the birth. About a year and a half later, Valcin suffered a ruptured ectopic (tubal) pregnancy which almost caused her death. According to Valcin, this near fatality caused her permanent physical and emotional problems.
In 1981, Valcin, joined by her husband, brought suit against the defendant, Public Health Trust of Dade County, d/b/a Jackson Memorial Hospital, alleging that the hospital, through its agents, (1) breached its warranty that the sterilization procedure performed on Mrs. Valcin would be one hundred per cent effective, (2) failed to fully inform her of the risks of a sterilization procedure in obtaining her consent, and (3) negligently performed the procedure. *1300 From a summary judgment entered in the hospital's favor on all three counts, the Valcins appeal.

I.
We affirm the judgment entered on the breach of warranty count. Section 725.01, Florida Statutes (1981), effective May 20, 1975, provides:
"No action shall be brought ... whereby to charge any health care provider upon any guarantee, warranty, or assurance as to the results of any medical, surgical, or diagnostic procedure ... unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof shall be in writing and signed by the party to be charged therewith or by some other person by him thereunto lawfully authorized."
Because it is undisputed that the alleged warranty that the sterilization would be one hundred per cent effective was not in writing, Section 725.01 clearly bars this claim.

II.
Although the alleged oral assurance of one hundred per cent effectiveness cannot support an action for breach of warranty, it can, as will be seen, support Mrs. Valcin's claims that her written consents to the surgery were fraudulently induced by this false assurance and/or were procured without the divulgence of necessary information, and that therefore, the surgery was performed without her informed consent.[2]
Section 768.46(4)(a), Florida Statutes (1981), provides:
"A consent which is evidenced in writing and meets the requirements of subsection (3) shall, if validly signed by the patient or another authorized person, be conclusively presumed to be a valid consent. This presumption may be rebutted if there was a fraudulent misrepresentation of a material fact in obtaining the signature."
It appears without dispute that during her hospitalization, Mrs. Valcin executed two consent forms preceding the sterilization surgery. One of these forms, a "Consent for Operative and Other Special Procedures," states, in pertinent part, that:
"The procedures listed [bilateral tubal ligation], their possible benefits, other methods of treatment, and complications from surgery or anesthesia have been fully explained to me by Dr. Sharpe. I have also been informed there are other risks such as severe loss of blood, infection, cardiac arrest, etc., that are attendant to the performance of any surgical procedure. I am aware that the practice of medicine and surgery is not an exact science, and I acknowledge that no guarantees have been made to me concerning the results of the operation or procedure."
The other form, a "Consent for Authorization for Sterilization," states, in pertinent part, that
"It has been explained to me by Doctor Sharpe that this operation [a bilateral tubal ligation] is intended to result in sterility, but this is not guaranteed."

A.
There can be no doubt that the consent forms executed by Mrs. Valcin reflect that she consented to the risk of a future pregnancy. Section 768.46(4)(a) provides that a written consent, if, as here, validly signed by the patient,[3] is "conclusively presumed" *1301 to be valid. But by this very statute's express terms, this so-called conclusive presumption "may be rebutted if there was a fraudulent misrepresentation of a material fact in obtaining the signature."
Mrs. Valcin's deposition reveals that at the time she entered Jackson Memorial Hospital to give birth to her fifth child, and, manifestly, before the execution of the consent forms and the sterilization, she discussed with Jackson personnel, nurses and doctors, her desire to be sterilized after the birth of the child she was then carrying. According to Mrs. Valcin, "they" told her "it was very simple; that they would tie my tubes up and they cut it and burn it and the chances of getting pregnant was nil." Mrs. Valcin also testified that shortly before she signed the consent forms, she was told by two of the doctors that "this one is perfect. This one would not go against it because they had a special method of doing this, that they cut it and burnt it and sealed it and there would be no chance of getting pregnant again. Millions have taken this operation and nobody had ever come up yet pregnant."
Whether the indisputably false representations alleged to have been made to Mrs. Valcin by representatives of Jackson were in fact made and induced her to give her consent are quite clearly issues of fact which cannot be determined in a summary judgment hearing.[4] Moreover, any determination (if, indeed, this was the basis of the trial court's ruling) that, as a matter of law, the conclusively presumed validity of the written consents precluded Valcin from relying on the inconsistent earlier representation would be contrary to this court's holding in Morganstine v. Rosomoff, 407 So.2d 941 (Fla. 3d DCA 1981), where, in reversing a judgment for the defendant-doctor and ordering a new trial, we held that the jury was entitled to be instructed that a fraudulent misrepresentation of a material fact in obtaining the patient's signature on the written consent, if found, overcomes the conclusivity of the presumption of a valid consent. We said in Morganstine:
"In the instant case, the record shows that Dr. Rosomoff testified that he fully advised Morganstine of all risks associated with the surgery, and the record contains a written consent form signed by Morganstine... . Morganstine testified, however, that Dr. Rosomoff assured him that there would be no complications. There was also evidence in the record to indicate that Dr. Rosomoff's statement, if made, wasn't true... . Whether any complications would be experienced by Morganstine following surgery was certainly a material factor in his decision to undergo the procedure. Since Morganstine testified his consent to the surgery was fraudulently obtained, this issue, though controverted, should have been submitted to the jury for resolution ... rather than having been determined by the judge as a matter of law." 407 So.2d at 943-44.
Likewise, in the present case, Valcin's testimony that she was assured about the absolute effectiveness of the sterilization (certainly a material factor in the decision to undergo the procedure), although controverted, raises a genuine issue of the validity of her consent, which must be resolved by the fact-finder.

B.
Even if the fact-finder were to ultimately find against Valcin on the foregoing claim, there will remain to be resolved her independent claim that her written consents were not, in the first instance, entitled to any presumption of validity.
*1302 Under Section 768.46(4)(a), the consent must, inter alia, "meet the requirements of subsection (3)" before it is accorded presumptive validity. That subsection provides, in pertinent part:
"(a)1. The action of the physician, osteopath, chiropractor, podiatrist, or dentist in obtaining the consent of the patient or another person authorized to give consent for the patient was in accordance with an accepted standard of medical practice among members of the medical profession with similar training and experience in the same or similar medical community; and
"2. A reasonable individual, from the information provided by the physician, osteopath, chiropractor, podiatrist, or dentist, under the circumstances, would have a general understanding of the procedure, the medically acceptable alternative procedures or treatments, and the substantial risks and hazards inherent in the proposed treatment or procedures, which are recognized among other physicians, osteopaths, chiropractors, podiatrists, or dentists in the same or similar community who perform similar treatments or procedures;" § 768.46(3), Fla. Stat. (1981).
Simply stated, no presumption of a valid consent will arise unless the consent is an informed consent. See Dandashi v. Fine, 397 So.2d 442 (Fla. 3d DCA 1981).
Consent is "informed" where the person knows the dangers and degrees of danger of a certain procedure to be performed. Bowers v. Talmage, 159 So.2d 888 (Fla. 3d DCA 1963). However,
"`[t]he duty of a medical doctor to inform his patient of the risks of harm reasonably to be expected from a proposed course of treatment does not place upon the physician a duty to elucidate upon all of the possible risks, but only those of a serious nature. Nor does it contemplate that the patient or those in whose charge he may be are completely ignorant of medical matters. A patient is obliged to exercise the intelligence and act on the knowledge which an ordinary person would bring to the doctors' office. The law does not contemplate that a doctor need conduct a short course in anatomy, medicine, surgery, and therapeutics nor that he do anything which in reasonable standards for practice of medicine in the community might be inimical to the patient's best interests. The doctrine of informed consent does not require the doctor to risk frightening the patient out of a course of treatment which sound medical judgment dictates the patient should undertake, nor does the rule assume that the patient possesses less knowledge of medical matters than a person of ordinary understanding could reasonably be expected to have or by law should be charged with having. Nor should the rule declaring a duty to inform be so stated or applied that a physician, in the interest of protecting himself from an overburden of law suits and the attendant costs upon his time and purse, will always follow the most conservative therapy  which, while of doubtful benefit to the patient exposes the patient to no affirmative medical hazards and the doctor to no risks of litigation... .
"`A doctor or specialist who fails to discharge his duty to inform would thus be liable as for negligence to the patient for the harm proximately resulting from the treatment to which the patient submitted... ."

Thomas v. Berrios, 348 So.2d 905, 907 (Fla. 2d DCA 1977) (quoting from ZeBarth v. Swedish Hospital Medical Center, 81 Wash.2d 12, 499 P.2d 1, 9-10 (1972).
Thus, the extent of the information which a doctor is required to impart depends on the circumstances of each procedure, Thomas v. Berrios, 348 So.2d 905, and expert testimony is required to establish what information must be conveyed to the patient under the circumstances. Ditlow v. Kaplan, 181 So.2d 226, 228 (Fla. 3d DCA 1965) ("[T]he standard to be applied is whether, according to expert testimony, a reasonable medical practitioner in the community would make such a disclosure under the same or *1303 similar circumstances."). See also Ritz v. Florida Patient's Compensation Fund, 436 So.2d 987 (Fla. 5th DCA 1983); Thomas v. Berrios, 348 So.2d 905; § 768.45(1), Fla. Stat. (1981). Cf. Buckner v. Allergan Pharmaceuticals, Inc., 400 So.2d 820 (Fla. 5th DCA), rev. denied, 407 So.2d 1102 (1981).
In addition to her claim that she was induced to sign the consent forms by false assurances about the absolute effectiveness of the sterilization, Mrs. Valcin claims that the risk of ectopic pregnancy was never disclosed to her  that is, her consent, even if not fraudulently induced, was not informed. While it will be Valcin's burden at trial to establish through expert testimony that an ectopic pregnancy is a recognized substantial risk inherent in sterilization and that the alleged failure of the hospital to advise Mrs. Valcin of this risk was a departure from an accepted standard of medical practice, it was clearly the hospital's burden at this stage of the proceedings to conclusively show either that Mrs. Valcin was advised of this risk or that not advising her of this risk was in accordance with accepted standards of medical practice. See Holl v. Talcott, 191 So.2d 40 (Fla. 1966); Shores v. Wegmann, 370 So.2d 87 (Fla. 1st DCA 1979); Reynolds v. Burt, 359 So.2d 50 (Fla. 1st DCA 1978); Mejiah v. Rodriguez, 342 So.2d 1066 (Fla. 3d DCA 1977).
It cannot be said that the hospital conclusively showed that Mrs. Valcin was advised of the risk of an ectopic pregnancy. The "Consent for Authorization for Sterilization," although clearly advising Valcin of the risk of pregnancy, makes no mention of the risk of ectopic pregnancy or any other risk. The "Consent for Operative and Other Special Procedures" limits its risk advice to "complications from surgery and anesthesia" and "other risks such as severe loss of blood, infection, cardiac arrest, etc. That are attendant to the performance of any surgical procedure." These documents do not show, much less conclusively show, that Mrs. Valcin was advised of the risk of ectopic pregnancy. Thus, Mrs. Valcin's testimony that she was not advised of this risk, even if contradicted, which it was not, created a genuine issue of material fact as to whether she was so advised, in the absence of the defendant having conclusively established that not advising Mrs. Valcin of the risk of ectopic pregnancy was in accordance with accepted standards of medical practice. The defendant made no effort at all to establish the latter fact.[5] Therefore, the summary judgment in favor of the hospital on this aspect of Mrs. Valcin's claim must be reversed as well.

III.
Lastly, we turn to Mrs. Valcin's claim that the sterilization was negligently performed. Although here, too, the hospital made no effort to introduce proof of its non-negligence, its position, as it was below, is that because Valcin's pretrial catalogue listed a single expert, Dr. Hammond, whose pretrial deposition conclusively showed that he could not testify that the sterilization procedure departed from acceptable medical standards, or that any such departure proximately caused Valcin's subsequent ectopic pregnancy, each of *1304 which must be proved, there could be no genuine issue of material fact as to either the hospital's negligence or the proximate cause of Valcin's injury.

A.
Because we indulge the assumption that most people behave non-negligently, the burden of pleading and proving negligence is ordinarily placed on the party who claims there has been a departure from the supposed norm. Thus, as a general rule, it is the plaintiff's burden to prove medical malpractice, and, except in that class of cases where the conclusion of medical malpractice can be reached through the exercise of the jurors' common knowledge and expertise, see Atkins v. Humes, 110 So.2d 663 (Fla. 1959), expert testimony is required to satisfy this burden. In the present case, the general rule would require Valcin to establish through expert testimony that the sterilization procedure was negligently performed and that such negligence was the proximate cause of her ectopic pregnancy and resultant maladies. It is apparent, however, that Valcin's conceded inability to meet this burden derives from the fact that the records of the surgical procedure, a needed basis for expert testimony, do not exist. Thus, while Dr. Hammond was able to testify that a delay of six days before performing a post-birth sterilization ordinarily would fall below the accepted standard of medical practice in the community, because of the lack of an operative report in Valcin's file, he was without sufficient information to give an opinion whether the six-day delay was negligent in respect to Valcin's sterilization or whether the operation itself was negligently performed.[6] Hammond stated:
"She had undergone a Pomeroy ligation and the ligation obviously failed. "Now, whether this was done properly or not is not in my opinion possible to ascertain without an operative note of a legitimate variety.
"The operative note on the progress note does not  is not revealing in this respect. I would not have done the procedure six days after surgery. The implication  I'll have to change that, six days after delivery. The implication here is that the colonization of the uterus with bacteria, which inevitably occurs after delivery, might have gotten into the tubes and prevented adequate healing of the tubes and may have contributed toward the failure of the Pomeroy sterilization.
"Now, Pomeroy sterilizations fail even when they are done within two days, but I suspect that the probability is that the percentages go up if they're done within a rather optimum time. "So, I would say from my point of view, the timing may have contributed toward the failure, but we won't know that because of the lack of the operative note.
"Q. This lack of the operative note, is that unusual?
"A. Every operation should be accompanied by a dictated note or a note that is written in longhand of a detailed nature as to the procedure, the findings and the results, so that not having an operative note is not acceptable medical care."

B.
The general rule that the burden of proof lies where the pleadings place it, see Selma, Rome & Dalton Railroad v. United States, 139 U.S. 560, 11 S.Ct. 638, 35 L.Ed. 266 (1891), works fairly so long as the party upon which the burden of proof is *1305 placed is in a better position to adduce the required proof. Where that is not the case, and it appears that facts essential to the matter lie "peculiarly within the knowledge" of the adverse party, courts have recognized that fairness dictates that the burden of proof be allocated to the adversary. See Selma, Rome & Dalton Railroad v. United States, 139 U.S. 560, 11 S.Ct. 638, 35 L.Ed. 266; Nader v. Allegheny Airlines, Inc., 512 F.2d 527 (D.C. Cir.1975), rev'd on other grounds, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976); Steil v. Florida Physicians' Insurance Reciprocal, 448 So.2d 589 (Fla. 2d DCA 1984); Leedy v. First Federal Savings & Loan Ass'n of Cocoa, 142 So.2d 99 (Fla. 2d DCA 1962); 29 Am.Jur.2d § 131 (1967), and cases cited therein. See also Collins v. Eli Lilly Company, 116 Wis.2d 166, 342 N.W.2d 37 (1984). Of course, given our modern day practice of liberal discovery, there is little need to reallocate this burden where the party claiming he was injured by another's negligence will have access to the evidence necessary to prove the claim and, indeed, the right to have such evidence produced.
However, where evidence peculiarly within the knowledge of the adversary is, as here, not made available to the party which has the burden of proof, other rules must be fashioned.[7] Thus, for example, where a party fails to produce evidence within his control or produces weaker evidence without satisfactory explanation, it being natural to produce the evidence, courts have held that an inference may be drawn that the withheld evidence would be unfavorable to the party failing to produce it, Appleton Electric Co. v. Advance-United Expressways, 494 F.2d 126, 139 n. 24 (7th Cir.1974); I.N.A. Aviation Corp. v. United States, 468 F. Supp. 695 (E.D.N.Y.), aff'd without opinion, 610 F.2d 806 (2d Cir.1979); Thor v. Boska, 38 Cal. App.3d 558, 113 Cal. Rptr. 296 (1974); Fuery v. Rego Co., 28 Ill.Dec. 115, 71 Ill. App.3d 739, 390 N.E.2d 97 (1979); see also Liddon v. Board of Public Instruction, 128 Fla. 838, 175 So. 806 (1937) (adverse inference from failure to produce witness); cf. Alter v. Finesmith, 214 So.2d 732 (Fla. 3d DCA 1968), cert. denied, 225 So.2d 538 (1969) (adverse inference from party's failure to testify). Where a party has intentionally destroyed evidence, some courts have held that an inference will be raised that the evidence would be unfavorable, I.N.A. Aviation Corp. v. United States, 468 F. Supp. 695; Carr v. St. Paul Fire & Marine Insurance Co., 384 F. Supp. 821 (W.D.Ark. 1974); Burkowske v. Church Hospital Corp., 50 Md. App. 515, 439 A.2d 40 (1982), while others have held that the destruction will be deemed an admission of the other party's allegations, Garrett v. Terminal Railroad Ass'n of St. Louis, 259 S.W.2d 807 (Mo. 1953); Moore v. General Motors Corp., 558 S.W.2d 720 (Mo. Ct. App. 1977).[8]See 31A C.J.S. Evidence § 153 (1964), and cases cited therein. Accord, Middleton v. Middleton, 188 Ark. 822, 68 S.W.2d 1003 (1934). In Florida, where vital discovery *1306 has been lost after litigation has commenced, or has not been turned over upon request, a judgment on liability against the offending party has been held to be an appropriate remedy. Mercer v. Raine, 443 So.2d 944 (Fla. 1983) (within the trial court's discretion to enter default against defendant for willful noncompliance with discovery order); Agencias Maritimas Nicaraguenses v. Usatorres, 435 So.2d 247 (Fla. 3d DCA 1983); DePuy, Inc. v. Eckes, 427 So.2d 306 (Fla. 3d DCA 1983).

C.
There is little question that Valcin's ability to prove her negligence claim against the hospital has been substantially prejudiced by the absence of critical hospital records. Whether the ultimate sanction of entering a judgment as to liability against the hospital should be imposed depends, in our view, on what the proof ultimately shows as to the reason the records cannot be produced. Since the evidence concerning the reason the records cannot be produced is peculiarly within the knowledge of the hospital, we deem it fair to preliminarily impose upon the hospital the burden of proving by the greater weight of the evidence that the records are not missing due to an intentional or deliberate act or omission on the part of the hospital or its employees. If the fact-finder, under appropriate instructions, determines that the hospital has sustained its burden of showing that Dr. Shroder did not deliberately omit making an operative report or, if one was made, that the hospital did not deliberately remove or destroy the report, then the fact that the record is missing will merely raise a presumption that the surgical procedure was negligently performed, which presumption may be rebutted by the hospital by the greater weight of the evidence. However, if the fact-finder is not satisfied that the records are missing due to inadvertence or negligence, then a conclusive, irrebuttable presumption that the surgical procedure was negligently performed will arise, and judgment as to liability shall be entered in favor of Valcin.
Thus, we hold that where a health care provider, statutorily and morally charged with the responsibility of making and maintaining records as a part of its obligation to promote the safe and adequate treatment of patients, negligently fails to do so, such health care provider shall have the burden of proving that the treatment which such missing records would reflect was performed non-negligently; and that where such health care provider intentionally fails to make or maintain such records, the treatment which such missing records would reflect shall be deemed negligent and the provider adjudged liable.[9]
In so holding, we plow no new ground. The burden-shifting principle is not new or novel. There are no hard-and-fast standards governing the allocation of the burden of proof in every situation. The issue, rather, "is merely a question of policy and fairness based on experience in different situations." 9 Wigmore, Evidence ¶ 2486 (Chadbourn rev. 1981). Likewise, the remedy of imposing liability for an intentional interference with an opposing party's right to seek redress in the courts is well precedented. See Mercer v. Raine, 443 So.2d 944; Agencias Maritimas Nicaraguenses v. Usatorres, 435 So.2d 247.
Our holding takes into account that the maintenance of thousands of hospital records is a burdensome undertaking in which errors may be expected to occur, but it is nonetheless the hospital's duty to maintain such records for, inter alia, the benefit of the patient. Because, as a matter of policy and fairness, we believe it would be unduly harsh to impose liability on the hospital where it has negligently failed in this duty, but unduly lenient to simply condone such errors at a patient's expense, we have concluded that the burden *1307 should shift to the hospital to prove that it was not guilty of medical malpractice. Where, however, the patient has been deprived of access to essential records through the deliberate acts or omissions of the hospital, we deem it appropriate that the hospital be foreclosed from any opportunity to rebut the presumption of medical malpractice and that liability be imposed on it, the patient being left with the burden of proving damages only. We trust this will encourage the implementation of appropriate safeguards to avoid negligence in the maintenance of hospital records and, at the same time, deter intentional and deliberate misconduct.

IV.
Accordingly, for the reasons set forth, the summary judgment on Count I is affirmed, and the summary judgment on Counts II and III is reversed and the cause remanded for further proceedings consistent with this opinion.
Affirmed in part; reversed in part, and remanded.

ON APPELLEE'S MOTIONS FOR CLARIFICATION AND REHEARING
We clarify our opinion in two respects. First, it is the duty of the physician, not the hospital, to obtain a patient's informed consent. Thus, when we referred in our original opinion to the hospital's liability for an alleged breach of this duty, that liability exists solely because the hospital, concededly the employer of the physician, would be vicariously liable for the physician's breach of his duty to obtain the patient's informed consent. However, unless the relationship between a hospital and a physician is such that the hospital is vicariously liable for the physician's acts, a hospital would not be liable for failing to obtain a patient's informed consent.
Second, although it is the duty of the physician, not the hospital, to make the operative note, the hospital has a separate duty on it to see to it that the medical records contain surgical treatment notes. Thus, whether an operative note has not been made or, if made, the hospital has failed to maintain it as part of its records or has destroyed it, the hospital's liability derives from a breach of a duty imposed on the hospital[1a] and does not depend upon a finding of vicarious liability.
The motion of Florida Hospital Association to intervene is granted and the opinion clarified as stated. All other post-opinion motions are denied.
NOTES
[1] Dr. Shroder was initially joined as a defendant. The suit against Shroder was dismissed pursuant to Section 768.28(9)(a), Florida Statutes (Supp. 1980), which provides that an employee of a state agency (here Dade County) cannot be held personally liable in a tort action arising from any act within the scope of his employment, unless it is alleged and shown that such employee acted intentionally or with gross disregard of the rights of the plaintiff.
[2] The specific nature of a cause of action for failure to obtain informed consent has been said to be somewhat confusing. At one time courts were undecided "as to whether it was an action for an unpermitted medical procedure involving trespass or battery, or an action for negligence involving a violation of the physician's duty to use due care in treating the patient." M. Plant, The Decline of "Informed Consent," 35 Washington & Lee L.Rev. 91, 91-2 (1978). In Florida, it has been described both ways. See, e.g., O'Grady v. Wickman, 213 So.2d 321 (Fla. 4th DCA 1968) (negligence); Brown v. Wood, 202 So.2d 125 (Fla. 2d DCA 1967) (negligence or assault and battery); Chambers v. Nottebaum, 96 So.2d 716 (Fla. 3d DCA 1957) (trespass).
[3] "A valid signature is one which is given by a person who under all the surrounding circumstances is mentally and physically competent to give consent." § 768.46(4)(b), Fla. Stat. (1981). Mrs. Valcin does not assert that she was not competent to sign the consents.
[4] Mrs. Valcin testified that without these assurances she would not have signed the consent form. She also testified that like assurances were made to her by the attending doctors after she signed the consents, but before the surgery, and that had those assurances not been given to her, she would have withdrawn her consent. Since it is apodictic that a consent may be withdrawn at any time before the act consented to is accomplished, see Goldberg v. State, 407 So.2d 352 (Fla. 4th DCA 1981); Berg v. State, 384 So.2d 292 (Fla. 4th DCA 1980), a fraudulent misrepresentation that induces a party not to withdraw the consent is, in our view, equally sufficient to overcome the presumption of a valid consent.
[5] The only evidence in the record bearing on this issue comes from Dr. Hammond, the gynecologist who treated Mrs. Valcin in 1980 when she was hospitalized for the ectopic pregnancy. After summary judgment was granted, Valcin petitioned for rehearing, attaching to her petition Hammond's affidavit, which stated that the "failure to specify or indicate that a tubal pregnancy is possible fails to properly inform the patient of the perils attendant to the particular operation. Such a failure to inform Mrs. Valcin falls below the standard of care of any physician performing a bilateral tubal ligation in this community... ." Although it is now clear that it is well within a trial court's discretion to accept an affidavit filed after a summary judgment hearing, see Coffman Realty, Inc. v. Tosohatchee Game Preserve, Inc., 413 So.2d 1 (Fla. 1982); Lufthansa German Airlines Corp. v. Mellon, 444 So.2d 1066 (Fla. 3d DCA 1984); Maddox v. Tallahassee Memorial Regional Medical Center, 438 So.2d 1041 (Fla. 1st DCA 1983); Stolzenberg v. Forte Towers South, Inc., 430 So.2d 559 (Fla. 3d DCA 1983), the trial court's rejection of the affidavit is immaterial, since the plaintiff had no burden to prove a departure from the standard of care in the absence of the defendant having come forward with expert testimony that the standard of care was met.
[6] All that Hammond could discern from the available information was that a Pomeroy-technique ligation had been performed six days after Mrs. Valcin gave birth. These facts appeared on the pathologist's report and on a nurse's note on the hospital chart. Additionally, the Pomeroy ligation was verified by Hammond's own observation when in 1980 he performed the emergency surgery on Valcin's ruptured ectopic pregnancy. He testified that ordinarily post-birth sterilizations are done within twenty-four hours of the birth, because after that time the uterus becomes colonized with bacteria which greatly increases the chance of infection, which, in turn, increases the chance that sterilization will fail. Because there was no operative record, Hammond could not say whether Mrs. Valcin's tubes were infected and could not otherwise determine whether the ligation was properly performed.
[7] It is an unassailable and eminently sensible principle of law that courts will intervene to prevent a party from benefitting from its own misconduct. Quite apart from Dr. Hammond's declaration that "not having an operative note is not acceptable medical care," there exists in Florida the Legislature's declaration that any licensed hospital must upon request furnish its former patient a copy of the patient's records, § 395.202, Fla. Stat. (1981), which, according to administrative regulations promulgated by Health and Rehabilitative Services, must contain, inter alia, "medical and surgical treatment notes and reports." Fla. Admin. Code Ch. 10D-28.59(3). An express purpose of these laws is to "promote safe and adequate treatment" of patients. § 395.02, Fla. Stat. (1981) (repealed effective July 1, 1982, and replaced by Section 395.001, Fla. Stat. (1983), in which the expressed purpose is "for the protection of public health and safety"). Thus, it is clear to us that the hospital's failure to have maintained and produced a record of Valcin's surgical procedure is a breach of a duty owing to her which cannot go unnoticed and, most assuredly, which cannot inure to the hospital's benefit. See Bondu v. Cedars of Lebanon Hospital Care Center, Inc., 473 So.2d 1307 (Fla. 3d DCA 1984) (Case Nos. 81-968 and 81-969, opinion filed this date).
[8] However, in many of these cases it has been held that some showing of bad faith must be made before the inference, see, e.g., Soria v. Ozinga Bros., Inc., 704 F.2d 990 (7th Cir.1983); Vick v. Texas Employment Comm'n, 514 F.2d 734 (5th Cir.1975), or the admission, see, e.g., Moore v. General Motors Corp., 558 S.W.2d 720, will be considered.
[9] Implicit in our holding is that the failure to maintain the records was due, as is apparent here, either to the hospital's negligence or intentional act or omission. We need not decide whether it would be appropriate to allocate the burden to the hospital to prove that the treatment was non-negligent where the failure to produce the records is shown to be beyond the hospital's control, as, for example, caused by an act of God.
[1a] Contrary to appellee's contention, our opinion in this case did not impose upon the hospital the responsibility of supervising the character or quality of the contents of the operative note. We read Dr. Hammond's testimony as stating that no operative note existed within the hospital's medical records. At the very least, the hospital, the recipient of a summary judgment in its favor, did not conclusively show on this record that an operative note exists.