538 So.2d 901 (1989)
Mary BROWN, Appellant/Cross Appellee,
v.
M. David SIMS, M.D.; South Miami Hospital Foundation, Inc.; the Florida Patients Compensation Fund; Florida's Physicians Protective Trust, Appellees, and
Christian Keedy, M.D., Appellee/Cross-Appellant.
No. 86-2031.
District Court of Appeal of Florida, Third District.
January 31, 1989.
As Corrected on Denial of Clarification and Rehearing March 2, 1989.
*902 Sinclair, Louis, Siegel, Heath, Nussbaum & Zavertnik and Paul Siegel, Miami, for appellant/cross appellee.
Carey, Dwyer, Cole, Eckhart, Mason & Spring and Pamela Beckham, Miami, for appellee M. David Sims.
Stephens, Lynn, Klein & McNicholas and Debra J. Snow and Robert M. Klein, Miami, for appellee/cross-appellant Christian Keedy, M.D.
Blackwell, Walker, Fascell & Hoehl and James E. Tribble and Paul R. Larkin, Jr. and Anthony D. Dwyer, Miami, for appellee South Miami Hosp.
No appearance for appellee Florida Patients Compensation Fund.
Before HUBBART, FERGUSON and JORGENSON, JJ.
FERGUSON, Judge.
Mary Brown, the appellant, suffered a devastating stroke during or shortly after elective abdominal surgery. She brought this medical malpractice action against the appellees David Sims, a gynecologist, Christian Keedy, a neurosurgeon, and South Miami Hospital. At the conclusion of the evidence, in a ten-day trial, the court directed a verdict for Dr. Sims. On the following day the jury returned verdicts for Dr. Keedy and the hospital. Mrs. Brown appeals the judgments entered for all the appellees. Dr. Keedy cross-appeals a procedural ruling which has significance only if the judgment in his favor is reversed.
Dr. Sims saw Mrs. Brown in his office on April 4, 1980, to evaluate an abnormal ovarian cyst. The doctor conducted a physical examination which included listening to Brown's heart and lungs with a stethoscope. While in the office Brown complained of pain in the right hand and arm and weakness in the right arm. Sims also recalled that Brown was holding her arm in a cradle position, as if in distress. Although Sims made no written notation of Brown's symptoms he did seek an opinion from Dr. Keedy, in connection with the complaints of pain and weakness in the arm, one day prior to the scheduled abdominal hysterectomy.
Dr. Keedy visited Brown in her room at South Miami Hospital on April 7, 1980, *903 where Dr. Sims had admitted her for the operation. Keedy had treated her previously for cervical disc problems. He testified that Brown complained to him of pain and weakness in the arm and right hand grip. Brown testified that she told Keedy that her hand had gotten weaker over the course of the preceding week. Keedy could not recall Brown's statement as to how long the condition had existed but did remember that she had objective grip weakness on the right hand side. Keedy testified that he performed a neurological examination; Brown contended that Keedy's only examination was to test her grip with a handshake. Keedy admitted that he did not auscultate[1] the carotid arteries in Brown's neck and that he never carries a stethoscope.
Dr. Keedy did not write a report for his April 7, 1980 consultation. He testified that he did not notate Brown's chart because a consult sheet was not available.[2] He did, however, orally give Dr. Sims presurgical clearance to operate on Mrs. Brown. Five days after the operation, on April 13th, Dr. Keedy did write a consult notation on Brown's chart. He also made a note in a "little black book" so that his office would bill $75.00 for the service. Although the evidence was conflicting as to whether the history and examination results were contraindications to surgery, Dr. Keedy admitted that if an endarterectomy[3] had been performed to remove an occlusion or block in the carotid artery prior to the abdominal surgery, Brown would not have suffered the disabling consequences.
Dr. Albanes, the staff physician at South Miami Hospital, took a patient history and testified that he also performed a physical examination of Mrs. Brown. Brown declared that Albanes never touched her. According to the plaintiff's expert if a comprehensive medical history had been taken and recorded by Dr. Albanes it would have disclosed significant facts concerning Brown's pain in the right upper extremity, a recent diagnosis of hypertension, complaints of falling and general weakness, sharp swings in body temperature, and progressive writing difficulties.
As a first point in this appeal Brown challenges rulings by the court which: (1) sustained the appellees' objections to evidence of accepted industry standards for keeping records of presurgical physical examinations; (2) excluded findings by a hospital accrediting agency that South Miami Hospital was deficient in its requirements for presurgical physical examinations; and (3) excluded evidence of an attempt by the hospital to suppress accrediting evaluations.
In part one of a second issue on appeal Mrs. Brown challenges rulings by the court which excluded testimony by a neurologist that Dr. Sims' failure to conduct a thorough preoperative examination constituted negligence. The second part of the issue alleges error in directing a verdict for Dr. Sims where there was competent expert testimony in support of the claim that Sims was negligent in proceeding with the operation without first obtaining a written report of a thorough presurgical physical examination.

I.

DIRECTED VERDICT FOR DR. SIMS
One of the appellant's experts, Dr. Gross, a neurosurgeon, testified at trial that Dr. Sims departed from accepted medical practice by neglecting to obtain a written *904 opinion from a competent physician clearing the patient for surgery and that this departure was a cause of the plaintiff's stroke. Dr. Cohen, another expert neurologist called by the plaintiff, was not permitted to testify that Dr. Sims failed to conduct a thorough presurgical physical examination. Cohen testified that he regularly does presurgical physicals for neurological and gynecological patients. In excluding his testimony the trial court made a finding that Dr. Cohen did not "possess sufficient training, experience and knowledge as a result of practice or teaching in the obstetrics and gynecologic specialty and that his experience does not qualify him to testify about Dr. Sims."
On this point the judgment cannot be affirmed. In an almost identical situation the Florida supreme court held that a neurologist was competent to testify as to matters of a gynecologist's presurgical standard of medical care. Chenoweth v. Kemp, 396 So.2d 1122 (Fla. 1981). The holding has been followed by this court, Scozari v. Muscarella, 434 So.2d 27 (Fla. 3d DCA 1983); Fetell v. Drexler, 422 So.2d 89 (Fla. 3d DCA 1982), and is a settled rule of law in this state, Wright v. Schulte, 441 So.2d 660 (Fla. 2d DCA 1983), rev. denied, 450 So.2d 488 (Fla. 1984); Mitchell v. Angulo, 416 So.2d 910 (Fla. 5th DCA 1982), and elsewhere, Radman v. Harold, 279 Md. 167, 367 A.2d 472 (1977). The harmless error doctrine, as applied in Chenoweth, can have no application here because it is the presurgical omission, rather than a surgical mishap, which allegedly caused the damage. Based on the expert testimony of the neurosurgeon, that Dr. Sims's conduct fell below accepted medical standards in the community, a directed verdict was inappropriate.
An even stronger case is made for a jury question based on the improperly excluded testimony of Dr. Cohen. We have spoken to this point with nauseating repetition. It is only in the absence of any evidence that a court should direct a verdict for a defendant. If the evidence is conflicting, or will admit of different reasonable inferences, or if there is any evidence tending to prove the issues, it should be submitted to the jury as questions of fact and not be taken away to be passed upon by the judge as questions of law. Quarrel v. Minervini, 510 So.2d 977 (Fla. 3d DCA 1987), rev. denied, 519 So.2d 987 (Fla. 1988); Idy Corp. v. Fenton, 454 So.2d 13 (Fla. 3d DCA 1984); Dandashi v. Fine, 397 So.2d 442 (Fla. 3d DCA 1981), (citing Hendricks v. Dailey, 208 So.2d 101 (Fla. 1968)); Behar v. Root, 393 So.2d 1169 (Fla. 3d DCA 1981); Laird v. Potter, 367 So.2d 642 (Fla. 3d DCA), cert. denied, 378 So.2d 347 (Fla. 1979).

II.

EXCLUSION OF INDUSTRY-WIDE STANDARDS
There is no disagreement that the document in question, a manual of the Joint Commission on Accreditation of Hospitals (JCAH), expresses a nationwide standard of care for hospitals. The admissibility of such industry standards is governed by a recent case of this court, Marks v. Mandel, 477 So.2d 1036 (Fla. 3d DCA 1985). See also Cornfeldt v. Tongen, 262 N.W.2d 684 (Minn. 1977), rev'd on other grounds, 295 N.W.2d 638 (Minn. 1980) (the standards announced in the JCAH manual, which had been adopted by the hospital in question, were improperly excluded on the issue of standards for anesthesia care); Darling v. Charleston Community Memorial Hosp., 33 Ill.2d 326, 211 N.E.2d 253 (1965) (evidence of standard regulations for hospitals is relevant on question of due care but not conclusive), cert. denied, 383 U.S. 946, 86 S.Ct. 1204, 16 L.Ed.2d 209 (1966).
The medical record services section of the manual is organized into a brief statement of principle followed by concise statements of standards. After each "Standard" statement is an explicative "Interpretation" section. For example following the Medical Record Services heading is the following statement of a "Principle":
The hospital shall maintain medical records that are documented accurately and in a timely manner, that are readily accessible, and that permit prompt retrieval *905 of information, including statistical data.
Standard II, one of three standards which follow immediately, provides:
The medical record shall contain sufficient information to identify the patient, to support the diagnosis, to justify the treatment, and to document the results accurately.
Following the statement of principle is a detailed "Interpretation" of the standard. One paragraph interpreting Standard II provides in relevant part:
The report of the physical examination. This report shall reflect a comprehensive current physical assessment... . The medical record shall document a current, thorough physical examination prior to the performance of surgery.
Ruling that the interpretation sections of the manual were inadmissible hearsay, the trial court permitted only the general standards to be admitted into evidence. Arguing that the general standards were meaningless without the additional interpretative material and that the ruling effectively gutted the manual's vitality, the appellant did not introduce evidence of industry-wide standards.
The physicians and hospital agree that the accreditation manual is an industry-wide standard and concede, implicitly, that the trial court was wrong in characterizing any part of the standards as hearsay. In answer to the point on appeal they argue: (1) the appellant waived the issue by not presenting the general standards as evidence; (2) the trial court did not abuse its discretion in restricting the evidence since the interpretation sections were prolix, confusing, irrelevant and cumulative; (3) the prejudicial impact of admitting the interpretive sections of the industry-wide standards outweighed any probative value; (4) the judgment should be affirmed on the basis of the two-issue rule; and (5) the ruling that the interpretation section of the JCAH manual was inadmissible hearsay constitutes harmless error. None of the arguments are persuasive.
The disputed issues on the negligence claim included: 1) whether there was a thorough presurgical physical examination; 2) whether a report of that examination was available to the operating physician and other professional staff persons for the purpose of making critical judgments regarding the patient's treatment; 3) whether a thorough physical examination and creation of an adequate medical record, to include the patient's history, would have alerted the treating physician and hospital staff that the patient was not a candidate for the contemplated surgery; and 4) assuming that minimal standards of care required a thorough physical examination and an available written report of that examination, whether the absence of either or both was a causal factor in the patient's subsequent injuries.
The interpretative sections of the manual, mandating and explaining why a thorough physical examination and preparation of a complete medical record shall precede surgery, were relevant and probative. The entire medical records section of the JCAH manual totals twenty pages. Stripped of the interpretations, the medical records portion is only three brief statements of broad goals without specifics as to what is required in order to meet the goals.

III.

INDUSTRY STANDARDS AND INTERNAL RULES ARE ADMISSIBLE
The public policy which prohibits use of internal operating rules as a standard of care for determining negligence is not a rule of admissibility. The rule is bottomed on a theory that the use of internal operating rules as the standard of care in negligence cases would discourage the voluntary setting of standards higher than those customarily employed in the community. Internal operating rules, nonetheless, are admissible as relevant evidence in negligence cases. More importantly industry-wide standards are admissible as relevant, although not conclusive, evidence of the standard of care. See Steinberg v. Lomenick, 531 So.2d 199 (Fla. 3d DCA 1988).

*906 IV.

EXCLUSION OF 1979 JCAH SURVEY
One year prior to Brown's operation the Joint Commission on Accreditation of Hospitals (JCAH) conducted an inspection of South Miami Hospital. In a February 1979 report, the commission made a specific finding of a deficiency in the hospital's recordation of "an adequate current history and physical examination", specifically for surgical patients. The deficiency noted by the commission is the same deficiency claimed by Brown to have proximately caused her disabling condition following routine surgery. South Miami Hospital's objection to the survey on relevancy grounds was sustained. From its comments in the record, the court was of the opinion that the survey was immaterial and unfairly prejudicial:
I have a 403 [sec. 90.403] problem with this, Mr. Siegel, basically whether or not this would be more confusing than helpful. It confused me. Does this mean none of their records were good? One out of a hundred was bad? One was illegible? Some were? A few were?
* * * * * *
The question is that I don't really know what this means. I mean, I don't think you need a board to come down to examine the hospital to tell you the record should include a current history and physical examination. Everybody knows that.
Evidence showing prior notice of a dangerous condition which causes harm is admissible to prove negligence. See Lawrence v. Florida E. Coast Ry. Co., 346 So.2d 1012 (Fla. 1977); Liberty Mut. Ins. Co. v. Kimmel, 465 So.2d 606 (Fla. 3d DCA 1985); Nance v. Winn Dixie Stores, Inc., 436 So.2d 1075 (Fla. 3d DCA 1983), rev. denied, 447 So.2d 889 (Fla. 1984). That a subsequent 1980 survey, filed prior to Brown's surgery, contained no deficiency finding with respect to medical reports was no basis for excluding the 1979 survey. The court's questions regarding the 1979 survey did not go to the legal issue of admissibility, but to the factual question of what weight should be given the document. Both the 1979 and 1980 documents should have been given to the jury along with any other testimonial evidence available to explain their significance. See Tibbs v. State, 397 So.2d 1120 (Fla. 1981) (the weight of the evidence is a determination of the trier of fact), aff'd, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).

V.

TWO-ISSUE RULE
Announcing the two-issue rule in Colonial Stores, Inc. v. Scarbrough, 355 So.2d 1181 (Fla. 1977), the Florida supreme court approved a district court decision affirming a judgment for the defendants entered on a general verdict form where the jury had been charged as to separate counts for malicious prosecution and false imprisonment. Appellant argued on appeal that he was entitled to a directed verdict as to the malicious prosecution count based on undisputed evidence and that, notwithstanding a general verdict, "if there were error as to either count the district court should overturn the judgment, as the jury may have based its verdict on the faulty count." Id. at 1184.
The district court disagreed. It held that since the judgment could be sustained on sufficient evidence of malicious prosecution, it would affirm the judgment without deciding the sufficiency of evidence necessary to sustain the false imprisonment count. The supreme court agreed with the district court, reasoning that it was not necessary for the district court to determine the sufficiency of the evidence to support the verdict as to the false imprisonment count because the appellant had not objected to the general verdict form.
Appellees, Dr. Keedy and South Miami Hospital, arguing the two-issue rule, say the judgment should be affirmed because it was entered on a general verdict where the only liability determination required was on the issue of legal causation. Relying on this court's opinion in Gonzalez v. Leon, 511 So.2d 606 (Fla. 3d DCA 1987), rev. denied, 523 So.2d 577 (Fla. 1988)  which extended the rule from multiple theories of *907 liability to multiple elements in a single theory of liability  they contend that the jury could have determined from ample evidence that the asserted negligence was not the proximate cause of the injury.
Assuming that the two-issue rule is applicable as to multiple elements in a single cause of action,[4] on the facts of this case the principle cannot be a basis for affirmance. The elements of negligence are (1) existence of a duty on the part of the defendant to protect the plaintiff from injury, (2) failure of the defendant to perform this duty, and (3) injury to the plaintiff proximately caused by such failure. Stahl v. Metro Dade County., 438 So.2d 14, 17 (Fla. 3d DCA 1983). Appellees contend that since it cannot be determined  because of the use of a general verdict form  whether the jury found no breach of a duty or whether it found no proximate cause, the judgment should be affirmed.
Where there is an erroneous exclusion of relevant evidence a judgment is sustainable under the two-issue rule only if the issue which the appellee relies upon as an alternative ground for affirmance is not also affected by the prejudicial evidentiary ruling. See Pfister v. Parkway Gen. Hosp., Inc., 405 So.2d 1011 (Fla. 3d DCA 1981) (general verdict on negligence claim covered all elements of negligence on which jury was charged, but two-issue rule applied as to collateral source payment issue, supported by separate evidence, which could have been the basis for the jury verdict), rev. denied, 413 So.2d 876 (Fla. 1982). Here the evidentiary rulings complained of affected all three elements  duty, breach, and proximate causation. It is clear from all the evidence, especially the improperly excluded evidence, that the appellees breached a duty to conduct thorough presurgical physical examinations and to prepare written reports of the examinations. The improperly excluded evidence, i.e., industry-wide standards and expert medical testimony, was relevant to both duty and proximate cause elements of the negligence claim. Indeed, the jury would not have reached the proximate cause question if it had determined that there was no duty or no breach of a duty. We hold that where all the elements of a single cause of action depend for proof on the same improperly excluded evidence the two-issue rule is inapplicable.

VI.

UNFAIR PREJUDICE
Section 90.403, Florida Statutes (1987), does not preclude the admission of all prejudicial evidence, only that evidence which is unfairly prejudicial. Whether evidence sought to be admitted is unfair is measured first by its relevance and probative value to material issues of fact. See Moreno v. State, 418 So.2d 1223 (Fla. 3d DCA 1982). In making that assessment the starting point is section 90.402, Florida Statutes *908 (1987), which provides that "All relevant evidence is admissible except as provided by law." No showing is made that the interpretations to the general standards are devoid of probative value; nor is there a showing that the interpretations otherwise come within any exception to the rule that all relevant evidence is admissible.
The prejudice claimed by the appellees, which might follow from admitting into evidence all of the industry-wide standards on medical records, is the kind that follows fairly  and expectedly by the offeror  from a presentation of relevant and probative evidence. Relevant evidence is inherently prejudicial; however, it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter. See United States v. Roark, 753 F.2d 991 (11th Cir.1985), (citing United States v. McRae, 593 F.2d 700, 707 (5th Cir.)), cert. denied, 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979).

VII.

CROSS-APPEAL OF DR. KEEDY
Relying upon this court's opinion in Valcin v. Public Health Trust Of Dade County, 473 So.2d 1297 (Fla. 3d DCA 1984), the trial court shifted the burden to Dr. Keedy to prove that he was not negligent in failing to make a record of the April 7, 1980 consultation. Dr. Keedy contends here that Valcin does not apply to independent physicians and that its burdenshifting feature does not apply unless the plaintiff alleges and demonstrates that the lack of a medical record has impaired her ability to go forward with a case. We dispose of the case on the valid second point without reaching the question whether Valcin has limited application to only hospitals.
In Public Health Trust Of Dade County v. Valcin, 507 So.2d 596 (Fla. 1987), decided after this cross-appeal was filed, the supreme court adopted this court's application of the rebuttable presumption when essential medical records are unavailable. At the same time the court stressed the limited function of the presumption. It was held that the presumption will apply only where the plaintiff establishes "that the absence of the records hinders his ability to establish a prima facie case." The presumption, the court ruled, "is given life only to equalize the parties' respective positions in regard to the evidence and to allow the plaintiff to proceed." Id. at page 599-600.
The real issue at trial here was not whether there was a failure to make and maintain a complete medical record of a thorough physical examination, but whether Dr. Keedy's failure to make a medical record was action that fell below the standard of care for a health care provider and whether that conduct proximately caused harm to Mrs. Brown. It is clear from the record that Brown was not hindered in her ability to present a case against Dr. Keedy; she didn't claim any inability or prejudice from the lack of a record. To the contrary, Mrs. Brown testified at trial as to what the medical records would have reflected had they been made and maintained. That testimony was supported by unrefuted information, verifiable by other sources. Brown also presented expert testimony at trial as to what the records should have contained based on the history verbally given to Keedy and other physicians. Unlike Marrero v. Goldsmith, 486 So.2d 530 (Fla. 1986), where the plaintiff was unconscious when the alleged act of malpractice occurred, Mrs. Brown had complete knowledge of the alleged negligent acts. Under the limitations imposed by the supreme court in Valcin, shifting the burden to Dr. Keedy was an improper application of the presumption.
For the reasons set forth above, the judgment for the appellees is reversed, the order shifting the burden of going forward with the evidence entered against Dr. Keedy is reversed, and the cause is remanded for a new trial.
NOTES
[1] Auscultation is the diagnostic action of listening, with a stethoscope, to movement sounds of the heart, lungs, blood vessels and internal organs. If the patient's circulation is abnormal the listener will often hear a discordant sound called a bruit.
[2] Alice Yates, a registered floor nurse at South Miami Hospital, testified that there are three ways to place consult reports on a patient's chart. The consulting physician can write the consult on a multi-copy form on the patient's chart, or if the form is not on the chart, blank forms are available at the nurses station where dictating equipment is also available. Consult reports may also be written on the progress note portion of the patient's chart. If the doctor's order sheet was available on Brown's chart, progress notes would have been there also.
[3] Endarterectomy is a surgical procedure to remove the inner lining of an artery that is clogged with plaque (pulpy, acellular buildup).
[4] Although Gonzalez does not control on the facts of this case, it is the writer's view that there is a question whether the Gonzalez extension of the two-issue rule is good law after First Interstate Dev. Corp. v. Ablanedo, 511 So.2d 536 (Fla. 1987). Ablanedo, decided July 9, 1987, twenty-three days after Gonzalez and while rehearing was pending in Gonzalez, holds: "This [two-issue] rule applies to those actions that can be brought on two theories of liability, but where a single basis for damages applies." Ablanedo can be interpreted as a circumscription of the two-issue rule. Such a restriction would be consistent with the factual setting from which the concept sprang into Florida jurisprudence. Gonzalez, itself without precedent, rejected the discussion in LoBue v. Travelers Ins. Co., 388 So.2d 1349-51 (Fla. 4th DCA 1980), rev. denied, 397 So.2d 777 (Fla. 1981), that the two-issue rule should not be extended to require a claimant to specifically demonstrate, by special interrogatory verdict, the precise element a jury found lacking in a single cause of action.

If Gonzalez has not been overruled by Ablanedo, practitioners in this district are on notice that it is not sufficient, for error preservation purposes, to present evidence in support of a theory and to request appropriate instructions. In order to demonstrate on appeal that an error was harmful, counsel must also tailor a special verdict form wherein the jury can make findings as to every element of every cause of action. Gonzalez also forewarns that any negligence verdict forms approved by the Florida supreme court, for use in conjunction with the Standard Instructions in Civil Cases, may be inadequate. Section 768.77, Florida Statutes (1987), which now requires an itemized verdict for categories of damages, does not also require an itemization of all negligence elements.